Filed 1/21/25  In re A.H. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>S. H. et al.,<br><br>     Defendants and Respondents;<br><br>A. H., a Minor,<br><br>     Appellant. | G064303<br><br>(Super. Ct. No. 19DP1410A)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Vibhav Mittal, Judge. Reversed and remanded with instructions.

Brent Riggs, under appointment by the Court of Appeal, for Appellant A.H. (Minor).

Leon J. Page, County Counsel, and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Respondent S.H. (Mother).

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Respondent D.S. (Father).

*          *          *

This appeal arises from an order by the juvenile dependency court selecting guardianship as the permanent plan for Minor, notwithstanding that Minor's long-term and loving caretaker was willing to adopt him. The court found that Minor and Mother had a strong bond and that the harm of severing the parental bond would outweigh the benefits of adoption. Minor appealed, contending the court abused its discretion.

We reverse. As this court recently concluded under similar circumstances in *In re Andrew M.* (2024) 102 Cal.App.5th 803 (*Andrew M.*), the evidence of detriment to Minor from severing the relationship with Mother was inadequate to overcome the strong Legislative presumption in favor of the stability and permanency that an adoptive home provides.

## FACTS

### I.

### DETENTION AND JURISDICTION PERIOD

Minor was born in late 2019 at a time when both Mother and Father were not only themselves minors, but also dependents of the courts. Because Mother had absconded from Orangewood Children and Family Center shortly before giving birth, Minor was almost immediately declared a dependent of the court.

When Minor was initially declared a dependent, Mother was given reunification services. Father did not receive reunification services. During this time, Mother was placed with foster mother Michelle, and Minor was likewise placed with Michelle. Mother was eventually switched to Family Maintenance services, and ultimately the first dependency petition was terminated after Mother and Minor reunified in July 2021. Mother and Father were given joint legal custody over Minor, but Mother was given sole physical custody with Father getting visitation.

The second and present petition was instituted in August 2021 as a result of repeated incidents of Mother leaving Minor at Michelle's house without letting anyone know and without securing supervision for Minor. The petition, which the court found to be true, was filed under Welfare and Institutions Code section 300, subdivision (b)(1) (inability to supervise adequately). It stated that on a certain evening in August 2021, when the child was not quite two years old, the mother left Michelle's house at approximately 10:00 p.m. without making arrangements for the child's supervision. The child was without supervision until the following morning when Michelle discovered Mother's absence. Later that evening, at approximately 9:15 p.m., Mother contacted Michelle and stated she was

3

trying to get a ride home but was unable to. She eventually returned home three days after she initially left. The next day, Mother agreed to a safety plan that included ensuring that Minor had adequate supervision at all times. However, the day after that, she once again absconded without making arrangements. Her behavior was consistent with a pattern of running away from her placements that she exhibited in her own dependency proceeding as a Minor. Mother also had a history of marijuana abuse.

At the time of the second petition, Father was in custody and unable to provide care for Minor.

Upon sustaining the petition in early November 2021, the court removed Minor from Mother's custody and granted reunification services to Mother, which included general counseling, substance abuse testing, parenting coaching, and Parent-Child Interaction Therapy. Minor was placed with foster mother Michelle.

## II.

### THE SIX-MONTH REVIEW PERIOD

During the first six-month review period, Minor was observed to be happy and comfortable in Michelle's home, and Michelle expressed willingness to adopt Minor should reunification fail.

Mother's progress toward reunification was considered moderate. Mother reported that the parenting coaching was going well. However, despite efforts by SSA, there was no available Parent-Child Interaction Therapy that Mother was eligible for.

Mother's substance abuse testing raised serious concerns. Between November 2021 and February 2022, mother missed 18 out of 19 drug tests, and the one time she did test, it was positive for Cannabinoid and CarboxyTHC. In late February 2022, mother tested positive for

4

Methamphetamine. In mid-March, she against tested positive for methamphetamine, and this time also THC.

Mother was allotted six hours of visitation per week, supervised by the paternal grandmother. In November and December 2021, Mother was somewhat inconsistent with visits. According to Michelle, Minor knew he was supposed to visit with Mother and when Mother did not show up, Minor became very upset. The paternal grandmother likewise observed Minor exhibiting problematic behavior when Mother was inconsistent with her visits. Mother explained that she had been missing visits because she did not have a car or the money to secure transportation to the visits.

In January 2022, Michelle reported that after visits Minor exhibited "more aggressive and angry behavior which usually subsides after about an hour or two." However, Mother did not miss any visits during that January.

Mother continued visiting consistently in February through April 2022, reporting that their visits were affectionate and enjoyable. Mother observed that Minor had a tendency to exhibit aggressive behavior, but that she corrected the behavior with timeouts and slaps on the hand. Michelle continued to report that Minor was temporarily acting out after visits.

In April 2022, the assigned social worker observed a visitation between Mother and Minor, reporting that Mother and Minor played with toys together, with Minor "smiling and laughing as he played with the mother." The mother then cooked fried asparagus and potatoes and they watched a movie together. Mother reported that Minor eats the food she cooks.

At the six month review hearing, SSA recommended continuing reunification services, which the court adopted.

5

III.

THE TWELVE-MONTH REVIEW PERIOD

In June 2022, Mother was kicked out of her transitional housing because staff found her with alcohol and drugs. She moved "sporadically from various places" over the course of the second review period and was unable to find a permanent residence. Minor was described as "well-adjusted, happy and comfortable" in his placement with Michelle. "He has been observed to have a positive relationship with the caregiver and calls her 'Mom.' During the monthly home visits, the child appears happy in the caregiver's care. He has been observed hugging and kissing her."

During this period, Mother was supposed to engage in conjoint therapy in lieu of Parent-Child Interaction Therapy. She scheduled an appointment to begin such therapy, but she failed to return the required consent forms and the referral was terminated.

Mother failed to do any drug testing during the second review period, claiming at first she was in the hospital (but she lost her discharge paperwork), and later that she could not get a ride. SSA had provided her with monthly bus passes.

In May 2022, the paternal grandmother decided to stop supervising visits, and thus Mother's visitation came to a halt. Mother indicated a desire to have her grandmother supervise visits, and though the maternal grandmother agreed, she was unable to provide rides for either Mother or Minor.

In late May and early June 2022, Mother claimed to be hospitalized due to burns. During her hospitalization, she claimed to be unable to make calls because she had no Wi-Fi and her "text app won't let

me." She was never able to tell the social worker what hospital she was at, and she later claimed to have lost all of her discharge paperwork.

Mother reported she was discharged in early June. She called the social worker once on June 21, but when the social worker called back there was no response.

On July 5, the social worker texted Mother to remind her to select a supervisor for visits since the maternal grandmother apparently was not going to work out. The following day, mother reported that she did not have anyone who was willing and able to supervise the visits. The following week, the social worker submitted a referral for assistance with supervision and transportation.

Two social workers agreed to supervise visits in Riverside, which was to begin in late July 2022, near where Mother was thought to be living. When those social workers contacted Mother in mid-July to set up the visitation, however, Mother revealed that she was living with her grandmother in Anaheim and requested that the visitation location be changed. Visitation resumed in early August 2022.

Mother's grandmother agreed to supervise visits beginning at the end of August 2022. However, the first visit was cancelled due to Mother not responding to the social workers. One week later, Mother's grandmother reported she kicked Mother out of the house because she believed Mother helped her "boyfriend" (i.e., Father) steal the grandmother's car. The grandmother "expressed her concerns that the mother is not fit to take care of the child and is not being responsible." She refused to supervise any visits moving forward.

In mid-September 2022, the paternal grandmother once again agreed to supervise visits for Mother.

Mother's compliance during the second review period was deemed minimal. In its 12-month status report, SSA recommended terminating parental rights and scheduling a permanency hearing pursuant to section 366.26 (.26 hearing).

In November 2022, Mother moved into transitional housing in the city of Tustin. This, in the court's words, "marked the beginning of notable progress made by the mother." However, that progress was not without setbacks, as we detail below.

The 12-month review hearing was continued for a few months, and on December 1, 2022, a new social worker was assigned to the case.

The new social worker met with Michelle on two occasions, in December 2022 and January 2023, and observed Minor to be "happy, and very active – smiling and laughing as he moved throughout the home playing with toys, and showing affection – hugging the caregiver and the undersigned."

Mother's transitional housing case manager reported that Mother was participating in their required education program, that Mother was making progress, and that Mother had recently secured a job at a local grocery store. Mother professed a willingness to do whatever it takes to get Minor back. She finally re-obtained a drug patch.

SSA produced an addendum report at the end of January 2023 in which it changed its recommendation, requesting that the court continue reunification services until an 18-month review hearing. At the 12-month review hearing, the court agreed and adopted SSA's recommendation.

## IV.

### THE EIGHTEEN-MONTH REVIEW PERIOD

Mother's first drug patch, collected January 5, 2023, came back negative.

In early February 2023, mother had her initial intake assessment for conjoint counseling.

Mother's housing remained stable at the transitional housing location and she maintained her employment at the grocery store.

Mother's visitation schedule stabilized, with her visits being split between two 3–hour sessions per week, one of which was supervised by a social worker. The supervising social worker "describe[d] the mother as engaged, responsive, and attentive to the child. The child is described as active, smiling, and laughing during visits."

In March 2023, SSA once again recommended that Mother's parental rights be terminated. Although SSA recognized the significant progress Mother had made, "there remain[ed] concerns which [left] the Agency unable to recommend imminent return to the mother due to her history of limited involvement with care, limited knowledge to understand and meet the child's needs; residential instability; mental health; and limited ability to organize and manage the household." At the same time, "the child [had] been residing with [Michelle] since September 3, 2021. The child needs a permanent plan and the caregiver would like to adopt the child and provide permanency for the child . . . ."

After SSA filed its report, it received notice that a drug patch that had been collected mid-February was positive for THC.

In late March, Mother had a supervised visit where the social worker reported: "the undersigned observed the mother during a portion of her visitation with the child. The child was observed to widen his eyes, make a big smile, and screamed, 'Mommy Sandy!' upon seeing the mother. The child held out his arms and quickly went into the mother's arms and embraced the mother tightly. The mother and child played on the swings for a while and then the mother went to her room to get a toy and diapers/wipes for the child. During the mother's absence, the child repeatedly asked for "mommy Sandy." The mother was observed to be affectionate with the child and showed acts of protection as she monitored his behavior and whereabouts."

In April 2023, the provider of Mother's drug patch reported that her "patch was not collected nor replaced because 'the patch looked totally compromised.' [The provider] stated the patch looked like it had been removed and then put back on. . . . [Mother] became upset when told it would not be collected, started cursing, and left without having another put on." Mother adamantly denied tampering with the patch.

In early May 2023, Mother had a new drug patch applied.

Later that month, mother successfully completed her conjoint therapy program. The therapist described Mother "as having been actively engaged and showing insight and progress in her parenting skills. [The therapist] expressed feeling that the child's emotional well-being would best be served by successfully reunifying with the mother."

Mother's visits were overall consistent during that May, and "[p]rogression to unsupervised visits [was] planned to start soon." "SSA staff, including the undersigned, have observed the mother-child bond, with smiles/excitement/affection readily exchanged between mother and child. The

10

mother has also been observed to show acts of protective, monitoring and redirecting the child appropriately."

Mother's drug patch tested negative on two occasions, but in June 2023, Mother tested positive for cocaine. In a subsequent patch, she tested positive for methamphetamine.

At the eighteen-month review hearing, the court adopted SSA's recommendation, terminated reunification services, and scheduled a selection and implementation hearing pursuant to section 366.26. At the hearing, Mother requested a bonding study, which was denied. Mother was granted continued funding for the drug patch and continued supervised visits with at least one visit per month being supervised by a social worker.

SSA's initial recommendation, submitted in late November 2023, was to terminate parental rights and select adoption as the permanent plan. Mother had been mostly consistent in her visitation since the previous report, and Mother and Minor continued to interact affectionately. With regard to one supervised visit in particular, the social worker made a comment that features prominently in this appeal: "The joy and excitement when the child saw the mother, on October 25, 2023, was unparalleled to anything previously witnessed by the undersigned. It is clear to the undersigned that there is a loving bond between mother and child." "It is believed[,] however, that the child likely sees the mother as a very fun friend/playmate and not necessarily as his mother."

On the other hand, Michelle was willing to adopt, she was "committed to providing [Minor] a stable, loving, permanent home," and Minor likewise exhibited "love and affection" for Michelle. It was noted that Minor had been living in Michelle's household nearly his whole life, and he "has been fully integrated into the family." The social worker "believed it is in

11

the best interest of the child to provide him with the stability, love, and support that [Michelle] is willing and eager to provide to the child."

In March 2023, the court held a hearing on a section 388 petition that had been filed by Mother and also on the .26 hearing. The court denied the 388 petition, and it provided a tentative ruling on the .26 hearing in which the court selected guardianship as the permanent plan. Though the court found Minor was adoptable by clear and convincing evidence, the court found that the parental-benefit exception to adoption applied. It observed that, over the course of the entire proceeding, Mother's visitation was "sufficient and regular." The court also noted that there was a strong bond between Mother and Minor, highlighting the enthusiastic way that Minor would greet Mother at visitation and that, in one social worker's words, the unparalleled joy and excitement Minor displayed upon seeing Mother. The court found that severing the bond with Mother would be detrimental to Minor. At a later hearing in which the court announced its final ruling, it found a compelling reason for determining that termination of parental rights would be detrimental to the child. The court selected guardianship as the permanent plan, appointed Michelle as the guardian, and terminated dependency proceedings. The court ordered three hours of visitation to Mother per week.

Minor, through appointed counsel, appealed. SSA did not.

DISCUSSION

Minor raises a single contention on appeal: that the court abused its discretion in selecting guardianship as the permanent plan rather than the statutorily-preferred adoption. We agree.

12

Section 366.26 governs the procedures applicable once the efforts to reunify the parent and child have failed. The goal at the section 366.26 hearing is " 'to select and implement a permanent plan for the child.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) This stage in the proceedings marks a shift in the proceedings: whereas up to this point the goal has been to reunify the family if possible, now the goal is to select a permanent plan that best serves the child's interests without regard to the parent's interests. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "[C]hildren have a fundamental independent interest in belonging to a family unit [Citation.], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that which allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.] The state's interest requires the court to concentrate its efforts, once reunification services have been terminated, on the child's placement and well-being, rather than on a parent's challenge to a custody order." (*Id.* at p. 307.)

Section 366.26, subdivision (b), sets forth the available options for a permanent plan "in . . . order of preference." The first, and thus most highly preferred option, is to terminate parental rights and order that the child be placed for adoption. (§ 366.26, subd. (b)(1).) Courts have described this as a "strong presumption" in favor of adoption. (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1801.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible

13

caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The other options, in order of preference, are to appoint a legal guardian for the child, or to place the child in long-term foster care. (§ 366.26, subd. (b); *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

In selecting a permanent plan, "the court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).) As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C., supra,* 11 Cal.5th at pp. 630-631.) " '[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

The relevant exception to adoption here is the parental benefit exception. To find that this exception applies, the court must find "a compelling reason for determining that termination would be detrimental to the child due to . . . the following circumstance[]: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a

14

*relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* 11 Cal.5th 614 at p. 631.) In deciding whether termination of parental rights would be detrimental, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C., supra,* 11 Cal.5th 614 at pp. 633-634.)

"A hybrid standard governs our review. [Citation.] The first two elements involve factual determinations to which the substantial evidence standard of review applies. [Citation.] The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion." (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.)

The first element of the parental-bond exception was not disputed in this case. Mother consistently visited with Minor.

The second element, whether Mother and Minor had a relationship that would benefit Minor, is disputed on appeal, but it was

15

supported by substantial evidence. The social worker's reports consistently observed a loving bond between Minor and Mother at visitation. In her most emphatic description of that bond, the social worker stated, "The joy and excitement when the child saw the mother, on October 25, 2023, was unparalleled to anything previously witnessed by the undersigned. It is clear to the undersigned that there is a loving bond between mother and child." (We will subsequently refer to this as the "unparalleled" statement.) Staff at the visitation center "observed the mother and child as having a loving and affectionate bond." A loving bond is plainly a benefit to Minor. Substantial evidence, therefore, supported the second element.

The real question in this appeal concerns the third element: whether the costs of severing that bond outweighed the benefits of permanency and stability that attend an adoptive home.

The court's finding on this issue was as follows: "When the Court went to the third element, the Court also found that mother has met her burden; that termination of parental rights would be detrimental to the Minor. The Court did the series of factual determinations it must under *Caden C.*, and, as the Court has already stated, the accounts and testimony are clear that the mother and [Minor] have a strong bond. He recognizes his biological mother as 'Mommy,' and stopping that visitation would be detrimental to [Minor]."

At the outset of analyzing this element, we observe that the court did not point to any evidence of detriment, and we have not found any such evidence in the record. There was evidence throughout the proceeding that Minor tended to act out after visitations with Mother. However, the court rightly recognized that in the absence of expert opinion, this evidence was ambiguous: does it mean that Minor misses Mother or that visitation with

16

Mother is stressful? In any event, the acting out tended to subside quickly—within a couple hours, or, at most, 24 hours.

At one point in the proceeding, Mother requested a bonding study, which may have provided the court with an expert report relevant to detriment. But the court denied that request without stating its reasons. Although we have no occasion to decide whether this was an abuse of discretion since neither party raised the issue, it certainly left a gap in the evidentiary record. As our high court explained in *Caden C., supra,* "often expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Caden C., supra,* 11 Cal.5th at pp. 632-633.) The court went on, "Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4.)

In terms of analyzing the third element, therefore, the only argument that can be made is that the relationship between Mother and Minor was such an obviously important component of Minor's mental health that severing the relationship would undoubtedly inflict significant harm.

But the broader context of Minor's life simply does not support that conclusion. Minor has lived with Michelle since he was six months old. Minor was one year old when he was detained from Mother; he was four by the end of the proceedings. During that time Minor had seen Mother, at most, six hours per week. Visitation never progressed to unsupervised visits, nor was visitation ever liberalized. Tellingly, when Mother missed three months of visits from May 2022 to August 2022, there was no evidence in the record that the cessation of visits had any ill effects on Minor. Moreover, outside of

17

the six hours of visitation and an occasional phone call, there was little evidence of Mother playing any role in Minor's life.

In contrast, the benefits of adoption by Michelle were clear. Minor was loving and affectionate with Michelle, comfortable in her home, and fully integrated with Michelle's family. Michelle was eager to provide a loving home for Minor. Of the 168 hours in any given week, at least 162 were spent in Michelle's care. For the vast bulk of Minor's life, the role of mother was filled by Michelle. Michelle was meeting all of Minor's needs and there were never any concerns noted with Michelle.

In this regard, the present case is much like *Andrew M.* In *Andrew M.,* as here, the minor was deemed adoptable but the trial court ordered guardianship, largely on the rationale that the affectionate visits between the minor and the parents supplied the required detriment. The *Andrew M.* panel reversed. "Even assuming a substantial emotional attachment between Andrew and the parents, the relationship between them cannot be deemed strong for purposes of the detriment analysis." (*Andrew M., supra,* 102 Cal.App.5th at p. 818.) The court observed, "Throughout Andrew's life, his only interactions with them were during hours-long visits, almost all of which were monitored. Although he shared an affectionate connection with the parents during visits and sometimes indicated reluctance to leave— through a tight hug or reaching out from his car seat—there is no evidence that he ever showed distress or was upset when separating from them." (*Id.* at pp. 818-819.) "Outside of visits, there is no evidence the parents played a meaningful role in Andrew's life." (*Id.* at p. 819.) "The juvenile court described no specific harm that [the minor] would likely or potentially suffer from the termination of parental rights." (*Ibid.*) "We do not suggest the parents must prove that any particular kind of harm would flow from the

18

termination of parental rights. But they must prove some type of harm beyond the fact that their loving visits would cease. [Citation.] [¶] In appropriate cases, the strength of the relationship alone can support a finding that its termination would have a 'destabilizing' effect on the child. [Citation.] But as discussed, the circumstances here do not support a conclusion that the parents' relationship with [the minor] was 'so important' as to outweigh the benefits of adoption." (*Id.* at p. 820.)

The present case bears many similarities to *Andrew M.*, as discussed above. The only evidence that would potentially distinguish *Andrew M.* and take the present situation beyond mere affectionate visits is the social worker's "unparalleled" comment above. But one anecdotal observation can only go so far. The same social worker who made the "unparalleled" comment above later described the bond thusly: "while the undersigned acknowledges there is a bond between the two, it can be argued that the bond is that between a child and a very dear relative or friend." Moreover, it was clear from various observers that Minor is an affectionate child in general. For example, in one visit observed by the social worker, when the social worker began to leave, Minor called the social worker by name and said, "Stop! I want to give you a hug and a kiss," which Minor then did. Another time the child saw the social worker arriving and "got up and quickly walked to the undersigned and leaned into the undersigned's legs for a hug." Thus, while the "unparalleled" anecdote certainly demonstrates a bond between Mother and Minor, in the broader context of Minor's life, a single observation of an enthusiastic greeting cannot carry the complete weight of overcoming the strong preference for adoption.

DISPOSITION

The juvenile court's order under section 366.26 is reversed, and the matter is remanded. The court shall hold a new permanency planning hearing forthwith and, absent an appropriate showing that changed circumstances justify different orders, shall terminate parental rights and order a permanent plan of adoption. In making that assessment, the court may, in its discretion, order a bonding study.[1]

SANCHEZ, ACTING P. J.

WE CONCUR:

DELANEY, J.

GOODING, J.

---

[1] Mother's motion to strike SSA's letter brief is denied. Mother's argument that SSA's letter brief amounts to an untimely appeal is not well taken. SSA is a respondent in this proceeding and is entitled to concede whatever issues it wishes on appeal. (*See Andrew M., supra,* 102 Cal.App.5th at p. 809 [in an identical procedural context describing SSA as "nominally a respondent"].) The letter brief did not raise any new arguments but simply joined in Minor's arguments.